# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

ROBERT WALKER, LEE NATHAN, and )
LEWIS FITE, )
        )
        Plaintiffs, )
        )     **Case No. 3:12-cv-0595**
v. )     **Judge Aleta A. Trauger**
        )
WHOLESALE, INC., STEVE BREWSTER, )
and KEVIN BARBER, )
        )
        Defendants. )

## MEMORANDUM

Pending before the court is the defendants' Motion for Summary Judgment (Docket No. 67), to which the plaintiffs have filed a Response in opposition (Docket No. 70), and the defendants have filed a Reply (Docket No. 79). For the reasons stated herein, the Motion for Summary Judgment will be granted in part and denied in part.

## BACKGROUND

Defendant Wholesale, Inc. ("Wholesale") is an automobile dealership with two locations in Nashville, Tennessee, referred to herein as "Eastgate" (located in Mount Juliet, Tennessee) and "Rivergate" (located in Madison, Tennessee). Defendant Steve Brewster owns Wholesale. During the time period relevant to this lawsuit, defendant Kevin Barber worked as the General Manager for Wholesale.[1]

The plaintiffs in this case, Robert Walker, Lee Nathan, and Lewis Fite, are three black former employees of Wholesale. Wholesale hired Walker in 2007. Barber promoted Walker to a

---

[1]Wholesale terminated Barber in March 2013 for misconduct unrelated to this litigation.

Finance Manager position, in which Walker worked during the time period relevant to this litigation. In August 2010, Wholesale (with Barber's approval) hired Nathan as a salesman, a position that Nathan held through the date of his termination. In February 2011, Wholesale hired Fite as a salesman. Fite quit his job on June 22, 2012, under circumstances he contends amounted to a retaliatory constructive discharge.

All three plaintiffs claim that Wholesale personnel subjected them to a racially hostile work environment by making racially derogatory statements, many of which were attributable to their co-worker (and later supervisor) Jay Ashcraft. Walker and Nathan also contend that Barber terminated them together on March 23, 2012 on the basis of their race, rather than for their (admitted) facilitation of a "straw purchase," a transaction in which the applicants listed on a credit application for financing do not include the intended primary driver of the car. Fite claims that Wholesale failed to promote him to either or both of two Finance Manager positions based on his race and that Wholesale unlawfully retaliated against him for filing this lawsuit. The plaintiffs bring suit under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq*. The plaintiffs have asserted individual claims against Barber and Brewster under § 1981 and the THRA for "aiding and abetting" the alleged unlawful conduct. The defendants have moved for summary judgment on all claims.[2] The court will address additional facts relevant to each of the

---

[2]In support of their Motion for Summary Judgment, the defendants filed a Memorandum of Law (Docket No. 68) and a Statement of Material Facts (Docket No. 69), which attached evidentiary materials, including the Declaration of Scott Hebrank (Ex. H), the Declaration of Kevin Barber (Ex. I), the Declaration of Raymond Bello (Ex. J), the Declaration of Bhody Raines (Ex. K), and the Declaration of James Ashcraft (Ex. M). In support of their Response in opposition to the Motion for Summary Judgment, the plaintiffs filed a combined Response to the Defendants' Statement of Material Facts and a Statement of Additional Material Facts (Docket

claims in the relevant analysis sections herein.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

---

No. 71), a Notice of Filing attaching deposition transcripts and exhibits (Docket No. 76), the Declaration of Christy McVey (Docket No. 72), the Declaration of Robert Walker (Docket No. 73), and the Declaration of Lee Nathan (Docket No. 74). In support of their Reply, the defendants filed a Response to the Plaintiffs' Statement of Additional Material Facts (Docket No. 78). Unless otherwise noted, the facts referenced herein are drawn from the evidentiary record, subject to the court's consideration of the parties' respective objections concerning certain asserted facts. *See also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

### I. Fite's Discrimination and Retaliation Claims

#### A. Discriminatory Failure to Promote

Fite asserts claims for failure to promote relative to two positions at Wholesale. Fite claims that Barber chose white candidates Chris Chambers (an internal promotion) and Joe Fyke (an outside applicant) over Fite to fill two available positions at Wholesale. Fite attempts to establish his failure to promote claims through circumstantial evidence.

To prove his failure to promote claims by circumstantial evidence, Fite must show that (1) he is a member of a protected class; (2) he applied and was qualified for the promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time his

request for the promotion was denied. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232,

240 (6th Cir. 2005).[3]  With respect to the fourth element, "it is incumbent upon the plaintiff to

establish that [he] and the non-protected person who ultimately was hired for the desired position

had similar qualifications."  *White*, 429 F.3d at 252; *see also Hicks v. SSP Am., Inc.*, 490 F.

App'x 781, 784 (6th Cir. 2012) (affirming summary judgment for defendant, where plaintiff had

not shown that she and male employee who received promotion possessed "similar

qualifications").  Here, even assuming *arguendo* that Fite has otherwise established the first

three elements of a failure to promote claim relative to each position, Fite has not presented

evidence establishing what Chambers' and Fyke's qualifications were at the time they filled the

positions that Fite allegedly sought.  Although Fite points out that Wholesale's Rule 30(b)(6)

representative (Steve Watson) was unaware of Chambers' and Fyke's qualifications, the burden

is on Fite, not Wholesale, to establish that he had similar or better qualifications than Chambers

or Fyke.[4]  Fite has not met this burden.  Therefore, the defendants are entitled to summary

---

[3]The parties agree that claims under Title VII, § 1981, and the THRA are subject to the
same legal and evidentiary standards as to all of the discrimination and hostile work environment
claims asserted in this lawsuit.  *See Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir.
2001); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001); *Barrett v. Whirlpool
Corp.*, 556 F.3d 502, 512 (6th Cir. 2009); *Nicholson v. City of Clarksville, Tenn.*, – F. App'x – ,
2013 WL 3746098, at *6 (6th Cir. July 17, 2013) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647,
658 (6th Cir. 1999)) (Title VII and § 1981 claims governed by same standard); *Johnson v.
Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 502 F. App'x 523, 542-43 (6th Cir. Oct. 18,
2012) (citing Tenn. Code Ann. § 4-21-311(e) and *Bobo v. UPS*, 665 F.3d 741, 757 (6th Cir.
2012)) (THRA claims governed by same standard as Title VII claims at summary judgment
stage).  As discussed herein, the court will assume for purposes of this opinion that this principle
still holds true with respect to Fite's retaliation claim.

[4]Furthermore, as the defendants have pointed out, Barber – not Watson – would have
been the most knowledgeable person concerning Chambers' and Fyke's qualifications.  Plaintiffs
deposed Barber but did not explore the issue with him.  Also, the record contains no indication
that the plaintiffs objected to Wilson's inability to recall details about their qualifications

judgment on Fite's failure to promote claims on this basis alone.

B. **Retaliation**

The plaintiffs filed this lawsuit on June 8, 2012.  At some point before that date, the plaintiffs and at least one other African-American employee, Eddie Booker, met with outside attorneys (now counsel for the plaintiffs in this case) about potentially participating in the lawsuit against Wholesale.  According to Fite, his supervisors learned about that meeting (apparently from Booker) and, from that point forward, began harassing him about it.

The record reflects the following chronology of events:

• In late May or early June 2012, Fite's supervisor, Ray Bello, confronted Fite to tell him that Booker had revealed that Fite was planning to sue Wholesale.  (Fite Dep. 108:7-18.)  Fite construed Bello as pressing him for information outside the presence of his attorneys.  Fite felt intimidated and denied (falsely) that he was participating in the forthcoming lawsuit.  Bello essentially accused Fite of lying, telling that him that Booker had already told him about the meeting.  Bello told Fite that "[y]ou know this is going to get out," and something to the effect of "[i]t's probably going to be pretty bad."  (*Id.* at 109:16-19.)  Bello indicated that he planned to speak with Barber about the matter.

• After their initial discussion, Bello again spoke with Fite about the issue.  Bello told him "Brother, . . . this is bad.  You're on there."  (*Id.* at 111:8-15.)[5]  Bello told Fite that "Fite's participation in the lawsuit was "going to get around the dealership.  If you are in it, I mean, let me know."  (*Id.* at 116:9-14.)  Bello also reiterated that "[i]t's just not going to be good."

_____

following his deposition as Wholesale's corporate deponent.

[5]It is not perfectly clear from the record which conversations took place before, rather than after, Wholesale received the Complaint.  Furthermore, it is not clear to the court whether and when Wholesale received an EEOC charge related to Fite – *i.e.*, before or after receiving the Complaint.  For purposes of this opinion, it makes no difference whether Wholesale first ascertained that Fite was (or may have been) participating in the lawsuit from Booker, an EEOC charge, or the Complaint.  The operative point for purposes of this opinion is that, once Wholesale got wind of the potential lawsuit from whatever source, Fite was repeatedly approached and questioned by his supervisors about the lawsuit.

(*Id.* at 116:15.)  From Fite's perspective, Bello "was prying for information" as to "what [the lawsuit] was about," and "trying to get details" about it.  (*Id.* at 114:2-4; 119:9-118.)[6]  On another occasion, Bello asked Fite whether he had "f[ound] out anything about the lawsuit."  (*Id.* at 121:19-22.)  Fite continued to deny involvement.

- In early- to mid-June 2012, apparently after Wholesale received a copy of the Complaint, Wholesale brought Fite into a meeting with Barber, Brewster, Bhody Raines (another supervisor), Mike Hillman (Wholesale's President), and Andanta Grainger (a black co-worker).  Raines tape-recorded the meeting.[7]  Before Fite entered the room, the participants discussed the Complaint, indicated that they hoped to force Fite to admit that he was participating in the lawsuit,[8] and commented that they did not believe the truthfulness of the allegations (*see, e.g.*, *id.* at 147:15-16 (Brewster: "You know, we may be a lot of things, we may do a lot of things, but that ain't one of them."))

- After Fite entered the room, the individuals present questioned him for approximately 20 minutes.  Barber told Fite, "I guess you and I have a mutual friend that brought something and said he heard rumors or whatever and wanted to know if you were involved in it, and said you weren't involved in it, and we got served these papers yesterday."

---

[6]As Fite put it: "I mean, this is my manager.  I mean, he's coming at me.  He was continuing to – he was, I guess, just prying for information, not on one occasion, but he did it twice . . . ."  (*Id.* at 120:8-11.)

[7]Raines apparently had a penchant for tape-recording conversations with employees.

[8]The relevant exchange was as follows:

| | |
|---|---|
| Brewster: | It's building, I guess the big thing, you know, that's coming is he's denied it, you know, all week. |
| Barber: | He's told us he ain't on it or whatever. |
| Brewster: | Or part of it. |
| Hillman: | Steve got the papers. |
| Brewster: | You know, I got it, and he's definitely on it, or definitely part of it, so . . . . |
| Grainger: | That's sad. |
| Brewster: | I know, but we would just like to hear him, you know, or at least show it to him in black and white *where he knows that we know*. |
| Hillman: | At least *we know about it*. |
| Raines: | Yeah. |

(*Id.* at 146:11-13 (emphases added).)

(148:13-22.)  Fite denied agreeing to participate in the lawsuit, at which point Barber repeatedly pressed him to admit otherwise.  After Fite continued to deny his involvement, Barber said, "So you're *sticking to your story then*?"  (*Id.* at 152:3-4 (emphasis added).)  Brewster stated that he was "surprised" to see Fite's name on the lawsuit.  Barber commented on the substance of Fite's claims, stating that "the thing is we talk time after time and you haven't felt like that's been our MO or whatever, which I know it ain't and that's not how we do things . . . ."  (*Id.* at 153:6-9.)  Barber told Fite that he (Barber) "need[s] to see something in writing" concerning Fite's relationship to the lawsuit.  (*Id.* at 153:22-23.)  Barber continued to comment on the substance of Fite's claim, stating that, "I haven't caught that you felt that way about us at all."  (*Id.* at 157:20-23.)  Towards the end of the questioning, Barber stated that, "if you did [join the lawsuit], you did, and so there is nothing that – you know, we ain't going to treat you differently either way, if you did or you didn't."  (*Id.* at 160:23-161:1.)  Wholesale encouraged Fite to call the lawyers identified on the Complaint about the issue and gave him their phone numbers.

- After the meeting and a few days prior to June 22, 2012, Fite admitted to Raines that he was participating in the lawsuit.  Raines told Fite that he was "getting some heat" from Barber about the fact that Fite hadn't reported back to Barber about his involvement in the lawsuit.  (*Id.* at 136:8-14.)  Raines told Fite "I like you a lot," but "[y]ou know, it's just not looking good."  (*Id.* at 136:13-17.)

- On June 22, 2012, Bello approached Fite at his (Fite's) desk and told Fite that "Barber wants you to come to the office."  (*Id.* at 137:25.)  When Fite looked over to Barber's office, he saw Brewster, Hillman, and Raines in the office (presumably in addition to Barber).  Fite decided to walk out of the building.  He did not return.

## B.  Legal Standard

Title VII prohibits employers from retaliating against employees who oppose an unlawful employment practice.  42 U.S.C. § 2000e-3(a).  Fite attempts to establish his retaliation claim through circumstantial evidence, under which he bears the initial burden of establishing the following *prima facie* elements: (1) he engaged in activity protected by Title VII; (2) Wholesale was aware of his protected activity; (3) Wholesale took an adverse employment action against him, or he was subjected to retaliatory harassment by a supervisor; and (4) there was a causal

connection between Fite's protected activity and the adverse employment action or harassment. *Johnson v. Univ. of Cincinnati*, 215 F. 3d 561 (6th Cir. 2000); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). If Fite establishes a *prima facie* case, the burden shifts to Wholesale to articulate a legitimate, nondiscriminatory reason for its actions. If Wholesale does so, the burden shifts to Fite to demonstrate, by a preponderance of the evidence, that the proffered reason was a mere pretext for discrimination. *See Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013). Wholesale does not dispute that Fite engaged in protected activity by filing a lawsuit against Wholesale alleging race discrimination. However, Wholesale argues that Fite cannot establish the remaining elements of his *prima facie* case and that, even if he could establish those elements, he cannot demonstrate pretext.

**C.     Application**

1.     <u>Prima Facie Case</u>

The court finds that there a genuine dispute of material fact as to whether Wholesale was on notice of Fite's participation in the lawsuit. Viewing the facts in the light most favorable to Fite, Wholesale received notice from Booker that Fite was intending to join a forthcoming discrimination lawsuit against Wholesale, Wholesale knew upon receiving the Complaint that Fite had sued them, and the statements preceding the June 2012 interrogation of Fite show that Wholesale was simply hoping to force Fite to admit that he had sued them in the face of "black and white" evidence. Although Fite denied participating in the lawsuit, it was only because Wholesale chose to harass him and press him for information through his supervisors, actions that (as described in the next section) were arguably retaliatory in and of themselves. While it may be that Wholesale earnestly believed that Fite was not involved the lawsuit, there is

sufficient indicia of Wholesale's knowledge to create a genuine dispute of fact.

The court also finds that Fite has established a genuine dispute of material fact as to whether he suffered an "adverse employment action." As an initial matter, "the scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008) (citing *Burlington Northern & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Thus, "[i]n contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment . . . ." *Hawkins*, 517 F.3d at 345. The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hawkins*, 517 F.3d at 347 (citing *Burlington Northern*, 126 S. Ct. at 2412-14).

The Sixth Circuit has explicitly found that "severe or pervasive" retaliatory harassment by a supervisor can support a retaliatory hostile work environment claim. *See Morris*, 201 F.3d at 792.[9] The Sixth Circuit has also found that a constructive discharge is a form of "adverse

---

[9]As construed by the Sixth Circuit in *Morris*, this theory of liability appears to implicate a blend of the *McDonnell Douglas* and *Ellerth* standards. *See Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998). A plaintiff must show that (1) he engaged in activity protected under Title VII; (2) the defendant was aware that he engaged in the protected activity; (3) the plaintiff suffered "severe or pervasive retaliatory harassment by a supervisor"; and (4) there was a causal connection between the protected activity and the harassment. *Morris*, 201 F.3d at 792. If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Id.* at 793. The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate that the proffered reason was not the true reason for the employment decision. *Id.* The employer may also prove an affirmative defense to retaliatory harassment by a supervisor by demonstrating: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.

action" under Title VII, provided that "the 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Kocsis v. Multi-Care Mgm't, Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (quoting *Held v. Gulf Oil Co*., 684 F.2d 427, 432 (6th Cir. 1982); *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) ("To demonstrate constructive discharge, Plaintiff must adduce evidence to show that (1) 'the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and (2) the employer did so 'with the intention of forcing the employee to quit.")).  Among the factors considered in the constructive discharge analysis are whether the employee was subjected to "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

The court finds that Fite has established a genuine dispute of material fact concerning the "adverse employment action" element, whether he proceeds under a constructive discharge theory, a retaliatory hostile work environment theory, or under the more flexible standard that protects an employee from any form of retaliatory conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  From the time Wholesale realized that Fite was discussing participating in a lawsuit against Wholesale, Fite was subjected to questioning by a parade of Wholesale management employees, including his direct manager, the General Manager, the company's owner, and the company's President.  Bello suggested that word of Fite's participation would have negative consequences, Wholesale subjected Fite to a 20-minute interrogation ending in Wholesale's encouraging Fite to remove his name from the caption of the lawsuit, and Raines later expressed that Barber was angry and

that things were "not looking good."  Fite was intimidated and testified that the repeated questioning interfered with his ability to work.  It appears that this course of conduct took place over fewer than four weeks.

Viewing the facts in the light most favorable to Fite, a reasonable jury could conclude (1) that Wholesale's conduct in reacting to word of Fite's participation in the lawsuit was sufficiently "severe or pervasive" to constitute retaliatory harassing conduct, (2) that Fite reasonably quit rather than face yet another intimidating interrogation by Barber and other Wholesale management employees in a closed office, and/or (3) that, under the flexible *Burlington Northern* standard, Wholesale's response would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."[10]

Wholesale does not address the causal element of Fite's *prima facie* case.  Indeed, Wholesale's actions with respect to Fite from late May through June 22, 2012 (whether lawful or unlawful) were motivated by reports that Fite had met with several attorneys to discuss filing a lawsuit against the company and/or by Wholesale's receipt of the Complaint in this case.

2.    Pretext

Wholesale argues that it questioned Fite simply to determine whether Fite was involved in the lawsuit, and that, after receiving the Complaint, it sought to "alert" him to the fact that he was named in the caption so that Fite could take "necessary action."  Wholesale has met its burden to produce a non-retaliatory motive for its actions.

_____

[10]A jury could find that, although Fite was subjected to conduct that would dissuade a reasonable worker from making or supporting a charge of discrimination, Fite was not justified in quitting (*i.e.*, he was not constructively discharged).  Under that scenario, it may be that Fite's damages would be limited to those accruing only through the date on which he quit.

To show that Wholesale's stated justification for its actions are a pretext for unlawful retaliation, Fite must show that the proffered reason (1) had no basis in fact; (2) did not actually motivate the challenged conduct, or (3) was insufficient to motivate the challenged conduct. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Wholesale argues that, in light of Fite's denials of participation in the lawsuit, Fite cannot demonstrate that Wholesale's reasons for questioning him were pretextual. However, Wholesale has not explained why, for the stated purpose, it needed to confront Fite repeatedly through his supervisors and in a closed-door interrogation by Wholesale's General Manager, President, and owner, among others. Furthermore, even after the June 2012 meeting, a Wholesale supervisor continued to press Fite about the issue, indicated that Barber was angry, and attempted to haul Fite into another closed-door meeting with management. Under the circumstances, a jury reasonably could find that Wholesale's stated reason for questioning Fite was not true, that it did not motivate Wholesale's actions, and/or that it was insufficient to justify Wholesale's repeated harassment of Fite.[11]

_____

[11]Before the Supreme Court's decision in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), the Sixth Circuit had applied a motivating factor test to Title VII and § 1981 claims. *See Bobo*, 665 F.3d at 756-77. However, in *Nassar*, the Supreme Court held that a plaintiff alleging retaliation under <u>Title VII</u> must show that the protected activity was a "but-for" cause of the alleged adverse action. *See* 133 S. Ct. at 2534. The Court emphasized that its holding was based on the particular language and structure of Title VII, as distinguished from other federal anti-discrimination laws, including § 1981. *Id.* at 2529-30. Recently, the Sixth Circuit expressly declined to address whether, in light of *Nassar*, § 1981 claims remain subject to the "motivating factor" standard (per *Bobo*) or are now subject to the same "but for" standard now applicable to Title VII claims under *Nassar*. *See Nicholson v. City of Clarksville, Tenn.*, – F. App'x –, 2013 WL 3746098, at *12 n.2 (6th Cir. July 17, 2013). Based on this court's own research, it appears that only a handful of courts have addressed the issue. In jurisdictions in which the relevant circuit court had already adopted the "but for" causation standard for Title VII and § 1981 retaliation claims even before *Nassar*, courts unsurprisingly have continued to apply the "but for" standard. *See Wright v. St. Vincent Health* Sys., — F.3d — , 2013 WL

## III.    Walker and Nathan's Discriminatory Discharge Claims

### A.    Facts

The parties have presented a substantial volume of materials relating to Walker and

Nathan's discriminatory discharge claims.  On March 23, 2012, Barber chose to terminate

Walker and Nathan with respect to a "straw purchase" that Walker submitted on that date.  In the

car sales industry, a straw purchase is one in which the credit applicants on a financing

application are different from the intended driver of the car, such as listing two parents on the

application related to a car for which their child (*i.e.*, someone not listed on the application) will

be the primary driver.  Banks, including Wells Fargo, disfavor this practice.  According to

Nathan, Walker, and Fite, straw purchases were a common practice at Wholesale during the

duration of their respective periods of employment.

In November 2011, Wells Fargo contacted Wholesale to complain that Raines, who is

white, had processed straw purchases on two vehicles.  The parties dispute whether the

transactions were actually straw purchases.  According to Barber, he investigated the

transactions and determined that they were not straw purchases.  According to Fite, Raines

admitted to Fite that the transactions were straw purchases and that Barber not only knew about

---

5225214, at *4 n.5 (8th Cir. Sept. 18, 2013); *Stewart v. Sodexo Remote Site P'ship*, 2013 WL
4519332, at *10 (E.D. La. Aug. 23, 2013) (applying Fifth Circuit pre-*Nassar* holding).  At least
two district courts addressing the issue, apparently as a matter of first impression, have construed
*Nassar* as supporting the application of the "but for" causation to § 1981 claims.  *See Alexander
v. City of New York*, — F. Supp. 2d — , 2013 WL 3943496, at *9 (E.D.N.Y. July 23, 2013);
*Welch v. Eli Lilly & Co.*, No. 1:10-cv-01705-LJM-TAB, 2013 WL 4413323, at *19 (S.D. Ind.
Aug. 15, 2013)).  Here, the parties have not addressed the causation standard.  Because the court
finds that there is a genuine dispute of material fact even under the more exacting "but for"
standard, the court need not resolve at this stage whether the "but for" standard applies to § 1981
claims.  However, resolution of this legal issue could have a meaningful impact at trial.

them, but had orchestrated them. At any rate, Wholesale was unable to convince Wells Fargo that the transactions were not straw purchases. Wholesale bought back the two vehicles. Barber took no disciplinary action against Raines.[12]

Wells Fargo employee Cynthia Hanley testified that, in approximately November 2011, Wells Fargo also determined that Raines had submitted "puffed income" applications, in which the income information on the credit application was falsely inflated – a practice that Barber admitted at deposition was illegal. (*See* Barber Dep. at 83:2-4.) Hanley said that, after Wells Fargo brought the matter to Barber's attention, Barber specifically warned Raines in her presence that, if Raines inflated customer incomes again, he would be fired.[13] According to the chronology attached to the McVey Declaration, Raines submitted puffed income deals on or about March 6, 2012 and March 13, 2012. Notwithstanding his previous warning, Barber took no disciplinary action against Raines with respect to those deals.

In November 2011, apparently in an effort to ensure that these incidents did not irreparably damage the relationship between Wells Fargo and Wholesale, Barber convened a

---

[12]In their affidavits, Raines and Barber provide details concerning the transactions and aver that they were not in fact straw purchases.

[13]Wells Fargo employee Christy McVey filed an affidavit that provides a chronology of credit applications that Wells Fargo had flagged for potential inconsistencies, including straw purchases and puffed income deals, among other issues. The affidavit provides limited context concerning the completeness and scope of this attached chronology. Notably, the affidavit references three straw purchase transactions involving Raines through "Nov/Dec 2011," but no "puffed income" transactions involving Raines before that time period. Therefore, it is unclear to the court whether, at her deposition, Hanley was simply confusing the straw purchase transactions with puffed income deals when discussing her recollection of flagged applications involving Raines, or whether she in fact was referring to additional transactions not listed on McVey's chart. Viewing the facts in the light most favorable to Walker and Nathan, the court will take Hanley's testimony at face value.

lunch meeting with Wells Fargo representatives. Walker and Raines accompanied Barber at the meeting, which took place at a "Darfon's" restaurant. Wells Fargo did not threaten to end its relationship with Wholesale at the meeting, although Wells Fargo did express its expectations with respect to credit applications going forward. The record contains inconsistent accounts about what happened outside the restaurant after the meeting. Barber recalls telling Walker and Raines that he would terminate any wholesale employee who participated in a straw purchase from that point forward, and Raines recalls hearing Barber make that statement. (*See* Barber Aff. ¶ 4; Raines Aff. ¶ 5.) By contrast, Walker avers that Barber said nothing of the sort. (Walker Decl. ¶ 3 (stating that Barber "did not state to me during the lunch meeting or afterwards that he would terminate me or anyone else if any 'straw purchases' were submitted at any time").)

      After the meeting (later that same day), Barber convened a meeting at the Rivergate location with his sales managers, including Ashcraft, Bello, Raines, and Chambers. Barber, Ashcraft, Sweeney, Raines, and Bello all aver that, at this meeting, Barber told them that, if they engaged in any straw purchases, they would be terminated. Walker, who had returned to the Eastgate location after the lunch meeting, was not present for this meeting. Nathan, who was merely a salesman, was not present either.

      At an unspecified point in mid-2011, Scott Hebrank, the Branch Manager for Nicholas Financial (a lending institution), contacted Barber to complain that Nathan had facilitated a straw purchase of a vehicle at Wholesale for an individual named William Pope. According to Hebrank, an unnamed "collector" had contacted him to inform him that Nathan had visited Pope's house and told Pope that the only way Pope's sister could purchase a vehicle from

Wholesale was for the loan credit application to be submitted in Pope's name only. Barber, Hebrank, and Nathan met to discuss the situation. According to both Hebrank and Barber, Nathan did not deny the collector's allegations or the fact that Nathan had engaged in a straw purchase. Furthermore, both Hebrank and Barber aver that, at the meeting, Barber told Nathan that, if Nathan were involved in another straw purchase, Nathan would be fired. Nathan recalls the meeting differently: although he recalls meeting with Hebrank and Barber, he avers that Hebrank did not accuse him of visiting Pope's house and that Hebrank did not reference any allegations made by a collector. Furthermore, Nathan avers that he was never asked whether he had been involved in any straw purchases and that Barber "did not say anything to me about my employment possibly being terminated for anything . . . ." (Nathan Aff. ¶ 3.)

As the court construes the chronology of events, Wholesale appears to concede that the only time Nathan would have a received a specific warning about straw purchases was in "mid-2011" with respect to the William Pope transaction. Wholesale also appears to concede that the only time Walker specifically would have received a warning about straw purchases was outside the restaurant immediately after the November 2011 lunch meeting with Wells Fargo. By the same token, the plaintiffs have not produced any evidence rebutting Wholesale's evidence that, on the same day as the lunch meeting, Barber warned Ashcraft, Bello, Raines, and Chambers that they would be fired if they engaged in straw purchases.

In February or early March 2012, Wells Fargo began auditing all deals submitted by Wholesale personnel. In connection with that audit, Wells Fargo flagged several transactions for potential inaccuracies, including deals submitted by Rich Craycroft (3/5/12 puffed income), Raines (3/12/2012 and 3/13/2012 puffed incomes), Walker (3/12/12 puffed income), Barber

(2/28/12 "payoff issue" and 3/12/12 puffed income), Chambers (3/13/12 puffed income), Bello (3/14/12 and 3/23/12 puffed incomes), and Ashcraft (3/22/12 income inaccuracy). All of the referenced managers other than Walker were white. At some point in March 2012, McVey contacted Barber to discuss several flagged deals. McVey also testified that she generally called Barber whenever she identified potential inaccuracies in the credit applications. Barber terminated Walker and Nathan (the salesman on Walker's March 23, 2012 transaction) but did not discipline, let alone terminate, any of the other (white) managers or associated sales personnel.

The parties dispute the gravity of the circumstances of the March 23, 2012 transaction for which Nathan and Walker were terminated. Briefly, Nathan was the salesman on a transaction involving a father, mother, and daughter who were attempting to purchase a vehicle to be used by the daughter. Nathan left two credit applications concerning this deal on Walker's desk, one listing the father and mother, one listing the father and daughter. Walker claims that he was not paying attention and submitted only the application with the father and mother, which he admits would have been a straw purchase transaction if processed. Walker contends that, as soon as he noticed the second application and realized the issue, he attempted to reach three different Wells Fargo contacts multiple times but received no answer. At the same time, McVey had already noticed the transaction and had contacted Barber to inform him that Walker had submitted what appeared to be a straw purchase. Barber contacted Robinson, who went over to investigate. Upon his own investigation, Barber determined that Walker had pulled the daughter's credit one week earlier, which Barber claims convinced him that Walker in fact had been aware all along that the transaction was a straw purchase for the daughter's benefit. That night, Barber decided

to terminate Walker and Nathan. Barber made this decision without speaking to Walker and Nathan beforehand.

When Hanley and McVey learned about Barber's decision, they were both "shocked." Raines and Ashcraft both believed, at the time, that Barber's decision was "weird" under the circumstances. On March 27, 2012, Walker met with Barber, who told him that he "hated to fire [Walker]," but he felt that "Wells had forced [his] hand." At deposition, Hanley and McVey stated that Wells Fargo had not told Barber to fire Walker, Nathan, or any other employee who had submitted one of the deals that Wells Fargo had recently flagged for review.

Viewing the facts in the light most favorable to Nathan and Walker, Wells Fargo made Barber aware of many, if not all, of the perceived inconsistencies listed in McVey's Declaration; of the white managers, Barber investigated only the Ashcraft transaction in an effort to clear him of any wrongdoing;[14] Barber took no disciplinary actions against the white managers; and Barber took immediate and drastic action with respect to Nathan and Walker.

### B. Legal Standard

The plaintiffs seek to establish their race discrimination claim through circumstantial evidence. To make out a *prima facie* case, they must show that (1) they are members of a protected class; (2) they were qualified for their jobs; (3) they suffered adverse employment actions; and (4) they were replaced by individuals outside of their protected class, or treated less favorably than similarly situated employees outside of their protected class. *Talley v. Bravo*

---

[14]According to McVey, Ashcraft submitted an application representing that the applicant had worked in a particular position for nearly 20 years, when in fact the applicant had only worked at the job for three months. (McVey Dep. at 26:1-8.) In the Barber Affidavit, Barber contends that the incident stemmed from an innocent misunderstanding about the applicant's work history.

*Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). The burden then shifts to the defendant Wholesale to articulate a legitimate, non-discriminatory reason for the discharge. *DiCarlo*, 358 F.3d at 414. If Whoesale carries this burden, the plaintiffs must then show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 414-415. The ultimate burden of persuasion remains with the plaintiffs. *Talley*, 61 F.3d at 1246 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

The plaintiffs, who were replaced by two white employees, have established a *prima facie* case.[15] The defendants argue that Wholesale terminated Nathan and Walker for engaging in a straw purchases in violation of a specific directive or directives from Barber not to do so, thereby satisfying the defendants' burden to produce a legitimate, non-discriminatory business reason for Nathan and Walker's terminations.

With respect to the issue of pretext, the court finds that there is a genuine dispute of material fact for trial. Although Wholesale argues that, at different times, Walker and Nathan both received verbal warnings that they would be fired if they facilitated a straw purchase, Walker and Nathan aver they never received warnings to that effect at any time before they were terminated. It is essentially the plaintiffs' word against the word of several other witnesses. Therefore, even assuming that the case turns on whether Walker and Nathan violated a specific warning not to engage in a straw purchase, a jury could credit Walker and Nathan's recollection

_____

[15]In their opening brief, Wholesale argued that the plaintiffs could not establish a *prima facie* case because they had not identified any "similarly situated" employees who were treated more favorably. As the plaintiffs stated in their response brief, they can also meet their *prima facie* burden simply by showing that white employees replaced them. The defendants did not respond to this argument in their Reply. Instead, they continue to argue that the plaintiffs have not identified "similarly situated" employees, which the court construes as an argument concerning pretext.

of events over that of Barber and other witnesses.[16]  Furthermore, according to Walker, Barber

falsely told Walker two days after his termination that Wells Fargo had either directed or

encouraged Barber to fire Walker and Nathan for the straw purchase.  At their depositions, Wells

Fargo's witnesses categorically denied having instructed Barber to take any actions with respect

to Walker and Nathan.  If the jury credits Walker's recollection of the post-termination meeting

over Barber's recollection of that meeting, it could conclude that Barber had lied to Walker to

cover up his true unlawful motivation.  Also, the jury could find that Barber's decision to

terminate Walker and Nathan without hearing "their side of the story" was consistent with an

unlawful motivation by Barber, particularly where Barber went out of his way to defend white

employees against similar accusations in the past.  Finally, although Barber had engaged in

progressive discipline of white employees in the past, Walker and Nathan contend that Barber

fired them without warning.  Thus, viewing the facts in the light most favorable to Walker and

Nathan, the jury could conclude that Barber's stated reason for terminating Walker and Nathan

was not true and/or that discrimination was the real reason for Barber's decision.

       Wholesale also argues that, assuming that Barber did warn Walker and Nathan not to

engage in straw purchases on pain of losing their jobs, Walker and Nathan have not shown that

another employee was treated differently for engaging in similar conduct.  Walker and Nathan

argue that other employees who may have engaged in "income puffing" or "income bumping" in

March 2013 were not disciplined by Barber.  Under the Sixth Circuit standard, the plaintiffs

---

[16]The jury might also take note of the fact that, notwithstanding the purported importance
of the discussion with Wells Fargo, Wholesale apparently did not issue any written directive
concerning straw purchases or otherwise modify the questionnaire utilized by sales personnel,
which did not include any specific question about whether the customer on the credit application
was actually intended to be the primary driver.

must show that the comparators "were similar in all relevant respects . . . and that [they] and [their][ proposed comparators engaged in acts of comparable seriousness." *Bobo.*, 665 F.3d at 751; *see also Harrison v. Metro. Gov't of Nashville*, 80 F.3d 1107, 1115 (6th Cir. 1996) ("'Precise equivalence in culpability between employees' is not required.") (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). The parties have submitted a substantial volume of materials on this issue, relating to whether several credit application inconsistencies identified by Wells Fargo after the November 2011 and February/March 2012 meetings (1) actually reflected the inconsistencies that Wells Fargo claimed, and (2) were of "comparable seriousness" to the straw purchase that Walker submitted on Nathan's behalf.[17]

Given the genuine factual dispute about whether Nathan and Walker received warnings in the first place, the court finds that wading into the thicket of information concerning the straw purchases and puffed income transactions would not be productive. The court will permit the parties to present evidence concerning these transactions at trial and, at the close of the evidence, the court will consider whether there is a genuine dispute of material fact as to whether the white employees flagged by Wells Fargo engaged in sufficiently similar conduct to the conduct for which Nathan and Walker were terminated.

On a final note, Wholesale argues that the "same actor" inference bars the plaintiffs' claims, because Barber both hired and fired Walker and Nathan. In *Buhrmaster v. Overnite*

---

[17]The Barber Declaration contains a detailed walkthrough of various applications flagged by Wells Fargo for alleged inconsistencies, in which Barber essentially avers that none of the transactions in fact reflected any actual data inaccuracies. It is not clear to the court (1) whether Wells Fargo communicated with Barber about each of the transactions at the time; and/or (2) whether Barber analyzed the referenced inaccuracies at the time or, in the alternative, whether he has only done so for purposes of this litigation.

*Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995), a Title VII discrimination case, the Sixth Circuit

upheld a <u>jury instruction</u> concerning the same actor inference, "which allows one to infer a lack

of discrimination from the fact that the same individual both hired and fired the employee." *See*

*also Hartsel v. Keys*, 87 F.3d 795, 804 n.9 (6th Cir. 1996 (finding that same actor inference,

among other evidence, supported district court's grant of summary judgment to employer in

discrimination case). Although it is a close question, the court finds that the same actor

inference, while likely the appropriate subject of a jury instruction at trial in this case, does not

require a grant of summary judgment to Wholesale here, in light of the other contextual

circumstances discussed above.

**IV.**     **<u>Hostile Work Environment Claims by All Plaintiffs</u>**

      **A.**     **Legal Standard**

To establish a hostile work environment claim, a plaintiff must show the following: (1)

the plaintiff was a member of a protected class; (2) he was subjected to unwelcome harassment;

(3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to

alter the conditions of employment and create an abusive working environment; and (5) the

defendant knew or should have known about the harassment and failed to act. *Williams v. CSX*

*Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). The harassment must satisfy both an objective

and a subjective test, meaning that it "must be so severe or pervasive as to constitute a hostile or

abusive working environment both to [a] reasonable person and the actual victim." *Randolph v.*

*Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). In determining whether the

harassment is severe or pervasive, a court must consider the totality of the circumstances. *Id.*

The court may consider a number of factors in assessing whether a hostile work environment

exists, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Id.* (citing *Harris*, 510 U.S. at 23). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment." *Faragher*, 524 U.S. at 788. The discriminatory conduct must be extreme to constitute a change in the terms and conditions of employment. *Id.*

Here, the gravamen of the plaintiffs' hostile work environment claim is that multiple supervisors subjected the plaintiffs to a racially hostile environment. Wholesale does not dispute that it could be held liable for its supervisors' actions. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807-808 (1998); *Clark v. United Parcel Serv.*, 400 F.3d 341, 348-51 (6th Cir. 2005).

### B.  Aggregation of Claims

Here, with respect to the alleged discriminatory statements, both parties have aggregated the discriminatory comments for purposes of applying the "severe or pervasive" standard. However, this approach conflicts with *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714 (6th Cir. 2012), in which the Sixth Circuit held that, "[t]o secure aggregated review of their [hostile work environment] claims on summary judgment, [the plaintiffs] need[] to marshal basic evidence to show that they were individually aware of the harassment experienced by other plaintiffs." *Id.* at 719. Thus, under *Berryman*, to the extent a plaintiff has not shown that he or she was individually aware of an alleged act of discrimination alleged by a co-employee, the court may not consider that act when applying the "severe or pervasive" standard to an individual employee. By the same token, under *Berryman*, the court must not restrict its analysis

only to harassing conduct or statements that an individual plaintiff actually experienced or observed – it is enough for the plaintiff to present "basic evidence" showing that the plaintiff was later made "aware" of the conduct or statement.

Here, having examined the record, it appears that the plaintiffs were not individually aware of *all* the alleged acts of discrimination at issue, taken collectively. Accordingly, in analyzing the hostile work environment claims, the court has examined the record to identify the allegedly harassing statements of which each plaintiff was aware, in addition to acts that each plaintiff experienced or observed.

> 1. <u>Nathan</u>

Nathan was hired in August 2010 and observed and/or became aware of racially discriminatory statements and jokes almost immediately after being hired. In the fall of 2010 (September or October), there was a dispute between Nathan and Ashcraft as to which of them had won "salesman of the month" at Wholesale, an award apparently premised on sales volume for a particular month. With respect to that dispute, Ashcraft stated, in front of at least one supervisor, Raines, and at least two other salesmen, that he would quit "if any nigger won salesman of the month." (Nathan Dep. at 64:16-19.) Nathan stated that he reported this incident to Walker (*i.e.*, the plaintiff in this case) and Barber, who was Walker's superior. Barber gave the award to Ashcraft and, viewing the facts in the light most favorable to Nathan, did nothing to reprimand Ashcraft.

In November 2010, Ashcraft made racist remarks about President Obama to Nathan in front of several other salespeople, stating that "the nigger shouldn't be president." (*Id.* at 65:25-66:4) In that same time frame, Nathan heard Ashcraft make "jokes" about a "nigger eating

chicken and things of that nature." (*Id.* at 65:25-66:4.) Nathan testified that he told both Barber

and Raines about these offensive statements and that they did "[n]othing." (*Id.* at 66:5-15.)

At a workplace Christmas dinner party in December 2011, Sales Manager Kevin

Robinson referred to himself as a "slave driver" and called Nathan his "slave" in front of

Nathan's wife and other Wholesale employees. (*Id.* at 68:25-69:19.) Nathan complained to

Barber, who was "intoxicated" and "shunned it off." Moreover, as a general matter, Nathan

testified that, when Nathan complained to him on multiple occasions, Barber "would not

communicate" with Nathan and "would not reach out and talk to me." (*Id.* at 71:11-15.)

At his deposition, Nathan did not state that he was aware of any racially motivated

incidents involving Walker. (*Id.* 106:22-107:1; 116:3-23.) However, Nathan was aware that

Fite had not received promotions to two positions that were filled by white co-workers. Nathan

also recalled hearing Fite complain about "some of the jokes we talked about[,] the nigger jokes,

how a chicken crossed the road, running from a nigger. Just crazy nigger jokes." (Nathan Dep.

at 117:16-23.) At deposition, Nathan could only recall the following specific joke that Fite

related to him: "Jay Ashcraft told [Fite] one time how a chicken crossed the road, . . . and

somebody said 'How?' He said, 'Because he's running from a nigger.'" (*Id.* at 118:3-6.)

However, with respect to the other jokes that Fite had related to him, Nathan stated that he

"didn't recall them all" and that Fite would know them. Viewing the facts in the light most

favorable to Nathan, the court will presume that Fite told Nathan about the racially

discriminatory jokes that Fite recalled at his (Fite's) deposition as taking place before March

2012, when Nathan was terminated. As described in the next section, these include the Big Foot

joke, additional discriminatory comments about President Obama in September 2011, and the

"Raisin Bran" joke.[18]

### 2.     Fite

 At an unspecified time, Ashcraft asked Fite, "You know what the difference [is] between a hard-working black man and Big Foot? . . . Big Foot has been discovered." *Id.* at 95:2-13.  Fite reported the incident to Raines and Bello, both of whom were sales managers at the time.  Bello responded by stating, "That's just Jay being Jay."  (*Id.* at 95:19-22.)

In approximately September 2011, Fite heard Ashcraft state something to the effect of "I can't believe they voted for that nigger because he's running this country into the ground."  (*Id.* at 99:9-12.)  Fite told Raines about the incident.  Raines simply "shook his head and [] said, 'Boy, Jay,' is all he did."  (*Id.* at 100:20-25.)

In February or April 2012, Ashcraft told Fite the following joke: "What do you call black people sitting on a bed of leaves? . . . [Y]ou call it Raisin Bran."  (*Id.* at 96:18-97:9)  Raines stated he would talk to Ashcraft, although the record contains no indication that Raines actually did so.

In March 2012, Craycroft (a manager) told Fite, "Wow, you really are a black man."  Fite recalls that Barber, Raines, and Chambers all witnessed the incident.  According to Fite, they said something to the effect of, "Man, that's not cool."  (*Id.* at 104:2-10.)

### 3.     Walker

Walker personally observed the following offensive comments by Ashcraft: (1) in 2010

---

[18]It is not clear from the record whether Ashcraft made the "Raisin Bran" joke before or after March 23, 2012, when Nathan was terminated.  Viewing the facts in the light most favorable to Nathan, the court assumes that it was made before Nathan was terminated and that Fite told him about it.

(month/time of year not specified in the record), Ashcraft made a joke in reference to "[n]iggers and the fact that [they] just don't have the intelligence to compete", and (2) Ashcraft made multiple comments about the "stupidity" of African-American customers at some point prior to July 2011 (*id.* at 24:19-26:12.)   Walker also recalled the "salesman of the week" incident in Fall 2010 involving Nathan but testified that Nathan did not relate to him any other racially derogatory incidents.  (*See* Walker Dep. at 41:15-18 ("Q: Did Mr. Nathan ever inform you or tell you about or report to you any other racially derogatory incidents at Wholesale, Inc.?  A: No.") Walker did not recall Fite's mentioning to him (Walker) any racially motivated incidents observed by Fite.  (*Id.* at 49:1-24; 121:7-17).[19]  Therefore, in addition to the comments observed by Walker, the court will consider the salesman of the week incident.  (*See also* 122:21-5 ("Q: Have you told us everything today that you're aware of with regard to the claim for hostile work environment and racially discriminatory statements by white managers?  A: Yes.").)

    4.    Application

    The record contains no evidence that Barber (or any other responsible management employees at Wholesale) undertook any investigation or disciplinary action with respect to any of these alleged incidents.  Indeed, according to Nathan, Barber refused to address the incidents when notified of them directly or indirectly.[20]

---

[19]Walker said that Fite "was uncomfortable working with Kevin Robinson . . . because of [Robinson's] attitude," but Fite did not tell Walker what had made him (Fite) uncomfortable, nor did Fite tell Walker that the issue was racially motivated.  (Walker Dep. 49:1-24.)

[20]Barber denies ever being aware of any complaints about racially tinged comments. This creates a dispute of fact as to whether Barber was actually notified of the incidents.  Be that as it may, according to the plaintiffs, other supervisors either witnessed or received complaints from Nathan about several of the incidents.

Under the totality of the circumstances, the court finds that there is a genuine dispute of material fact as to whether the discriminatory statements of which each plaintiff was aware were sufficiently "severe or pervasive" to support a hostile work environment claim. Viewing the facts in the light most favorable to Nathan, Nathan repeatedly was the subject of, heard, and/or became of aware of highly offensive racist comments by Ashcraft, as well as a humiliating and dehumanizing comment by Robinson referring to Nathan as a "slave" in front of Nathan's wife and co-workers. These comments began almost immediately after Nathan was first hired for the position in August 2010 and continued at least through December 2011 (and likely longer), just three months before Nathan was terminated. Although Nathan complained to multiple supervisors and to Barber directly, nothing was done to investigate, let alone address, these incidents. Barber, who apparently assumed ultimate responsibility for addressing complaints by employees, refused to speak with Nathan or otherwise "shunned" him for raising these issues.

Similarly, Fite overheard, was the subject of, and/or was aware of numerous racially offensive comments by Wholesale supervisors. Multiple supervisors, including Barber, witnessed at least one of these incidents but made no meaningful response. Fite also complained to multiple supervisors about the comments and nothing was done. Walker's experience was generally consistent with that of Nathan and Fite: Walker overheard Ashcraft consistently denigrate blacks, insulting their work ethic, intelligence, and right/ability to succeed in the workplace.[21]

Finally, it is not lost on the court that, notwithstanding a formal antidiscrimination policy,

---

[21]Although Walker recalled the fewest specific incidents of the three plaintiffs, the courts finds that it will be for a jury to decide whether the statements of which he was aware were sufficient to constitute a racially hostile work environment.

Wholesale appears not to have utilized formal mechanisms for addressing workplace discrimination issues. The defendants rely on an excerpt from Wholesale's employee handbook, which states that "[a]ny form of illegal discrimination against you or any applicant will not be permitted" and that "[i]t is your responsibility to report complaints of discrimination to management." (Docket No. 69, Ex. B, at p. 5.) This excerpted portion of the handbook does not define what "management" means. In another section, it "*urges* each employee to report all incidents of harassment to the employer's General Manager." (*Id.* at p. 6. (emphasis added).) Giving the term "urges" its customary usage and construing the facts in the light most favorable to the plaintiffs, the court construes the handbook as not *requiring* Wholesale employees to report complaints directly to the General Manager (here, Kevin Barber), but simply *encouraging* them to do so, without precluding them from complaining to other undefined "management" employees.

If the plaintiffs' testimony is credited, management employees, including the "general *manager*" (Barber), "sales *manager*" (Chambers, Bello, and others) and/or "general sales *manager*" (Raines), witnessed and/or received complaints from the plaintiffs about racially discriminatory conduct and statements by Wholesale personnel. Thus, a reasonable factfinder could conclude that the plaintiffs complied with the handbook terms, to the extent required.

Moreover, the defendants have not provided written documentation of any formal means by which Wholesale "management" was supposed to handle employee grievances. For that matter, having combed the record, the court has not identified any deposition testimony setting forth Wholesale's approach for receiving, investigating, and addressing complaints of racial harassment. Indeed, if the plaintiffs' testimony is credited, Wholesale essentially let Ashcraft –

and, in one instance, Robinson – continue to make racially demeaning jokes, comments, and epithets without investigation, without acknowledging that the plaintiffs' complaints merited serious consideration, and, most importantly, without consequence.

Barber denies that he ever observed or received any complaints about racial discrimination by, from, or relating to the plaintiffs. Ashcraft denies ever making the alleged racially discriminatory statements. Aside from pointing out that there are genuine factual disputes as to both issues – on which summary judgment is therefore inappropriate – Wholesale has not meaningfully opposed the hostile work environment claim on any grounds other than the "severe or pervasive" element. Therefore, the court will permit the plaintiffs' hostile work environment claims to go forward.

## V.      **Aiding and Abetting**

### A.      **THRA Individual Liability**

Under the THRA, an individual supervisor may be held liable for "aiding and abetting discrimination," if the evidence shows that the supervisor "encouraged the employer to engage in the employment-related discrimination or prevented the employer from taking corrective action." However, "a supervisor who is merely acting in fulfillment of his duties cannot be held individually liable for discrimination under the THRA." *Eppes v. Enterp. Rent-a-Car Co. Of Tenn.*, No. 3:05-cv-458, 2007 WL 1170741 (E.D. Tenn. Apr. 18, 2007) (citing *Crutchfield v. Aerospace Ctr. Support*, No. 98-6105, 1999 WL 1252899, at *2 (6th Cir. Dec. 14, 1999)); *Thompson v. City of Memphis*, 491 F. App'x 616, 621 (6th Cir. 2012) (holding that, where defendant supervisor undertook actions while acting in her supervisory capacity, supervisor could not be individually liable under the THRA); *see also Jenkins v. Nashville Public Radio*,

No. 3:02CV0179, 2005 WL 3358871, at *7 (M.D. Tenn. Dec. 9, 2005) ("Liability . . . is not imposed based on the individual defendant's *own* discriminatory acts; it requires distinct conduct that aids or abets discrimination by the employer.")   Thus, the action taken by the supervisor must be "separate and distinct from acting as a supervisor."  *Welles v. Chattanooga Police Dep't*, No. 1:07-CV-71, 2007 WL 3120823, at *4 (E.D. Tenn. Oct. 23, 2007).

Here, the plaintiffs essentially conceded at deposition that Brewster was not involved in the alleged discriminatory actions in any respect and that the plaintiffs sought to hold him liable only on a *respondeat superior* basis.  Therefore, summary judgment in favor of Brewster on the THRA claim is warranted.  Barber is also entitled to summary judgment on the THRA claim, because the only alleged discriminatory conduct by Barber occurred in Barber's capacity as a supervisor.

**B.      § 1981 Individual Liability**

Some courts have recognized a claim under § 1981 against individual defendants, provided that those individuals exercised supervisory authority over the plaintiff and were personally involved in the discriminatory action.  *See, e.g., Allen v. Ohio Dep't of Rehab. & Corr.*, 128 F. Supp. 2d 483 (S.D. Ohio 2001) (discussing theory in *dicta*); *Williams v. United Dairy Farmers*, 20 F. Supp. 2d 1193 (S.D. Ohio 1998) (citing *Jones v. Continental Corp.*, 789 F.2d 1225 (6th Cir. 1986)); *Williams v. Morgan Stanley & Co., Inc.*, 2009 WL 799162, at *9 (E.D. Mich. Mar. 24, 2009) (collecting out-of-circuit cases and dismissing claims against individual defendants who did not allegedly supervise the plaintiff); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).  These courts have generally required some affirmative action – rather a failure to act – by the supervisor that was causally connected to the

discriminatory action. As discussed in the previous section, the plaintiffs have adduced no evidence showing that Brewster was personally involved in the termination decision. Therefore, the court will dismiss this claim relative to Brewster without further analysis.

As to Barber, the parties' briefing concerning the existence and scope of this theory of liability within the Sixth Circuit leaves something to be desired. First, the parties have not addressed at least one threshold issue that is likely dispositive: § 1981 applies to *contracts*, and the parties have not presented evidence that Barber was a party to an employment contract with any of the plaintiffs.[22] Thus, the court has no reason to believe that § 1981 governs Barber (rather than Wholesale) in the first place. Second, although the defendants argue the merits of applying the standard articulated in *dicta* in *Allen* here, the court is not convinced that this is a viable theory of liability within the Sixth Circuit, at least in a manner that would effectively subject any decision-maker to individual liability for alleged discrimination. Third, even assuming that § 1981 could provide a basis for recovery against Barber, the plaintiffs have drawn no distinctions in how it might apply differentially to the retaliation, discrimination, and hostile work environment claims. Fourth, and perhaps most importantly, the plaintiffs have not meaningfully responded to the defendants' argument that the plaintiffs have failed to adduce evidence supporting the individual liability claims against Barber with respect to any of their overarching causes of action. The plaintiffs simply state in a footnote that the Sixth Circuit recognizes that § 1981 can support individual liability against a supervisor, *Jones*, 789 F.2d at

---

[22]For that matter, it is not clear to the court that the plaintiffs even had employment contracts with Wholesale in the first place. The cover letter to the Employee Handbook states that "[y]ou are free to resign at any time, for any reason, with or without notice.' (Docket No. 69, Ex. B. at p. 3.)

1231, but the plaintiffs identify no evidence and make no argument in support of that theory of liability.

Where the plaintiffs have failed to identify any evidence supporting their individual liability theory and have failed meaningfully to respond to the defendants' argument that summary judgment is appropriate on the individual liability claims against Barber (and Brewster) under § 1981, the court will dismiss those claims. Therefore, the case will proceed to trial against Wholesale only on the § 1981 claims.

## CONCLUSION

For the reasons stated herein, the court finds as follows:

• Fite's failure to promote claims will be dismissed with prejudice.

• All claims against Brewster and Barber will be dismissed with prejudice.

• The following claims against Wholesale will proceed to trial: (1) Fite's retaliation claims; (2) Nathan and Walker's claims for discriminatory discharge; and (3) the plaintiffs' hostile work environment claims.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge